May it please the Court, Gregory Joseph for appellants. I'd request three minutes for rebuttal, please. Your Honors, defendants claim that it is the plaintiff's theory that, one, it was inevitable that the stock price would fall, two, it was inevitable that gaming demand would fall, and three, defendants knew that the gaming demand would be insufficient to offset the loss of crypto demand. And they say that at pages 2, 3, 22, and 26 of their brief. Their theory is, well, then it makes no sense that we would commit securities fraud. It's a strongman argument. Nowhere is it alleged that it was inevitable that the stock price would fall. Nowhere is it alleged that defendants knew it was inevitable that gaming demand would be insufficient to offset the loss of crypto demand. You know, their argument strikes me as, if somebody's engaged in a Ponzi scheme, which is not this case, why would anybody engage in a Ponzi scheme when they know that it's inevitable that the scheme will eventually collapse? Well, somehow people do Ponzi schemes. Exactly. I mean, the issue here is that it is conceivable that crypto demand would be offset by rising demand from pent-up gamer demand because they hadn't been able to get chips by offsetting new innovations, which would create demand. As Judge Posner said, the defendants could have hoped that the ship would right itself. There was nothing inevitable other than, and it is alleged that the mining demand was inevitable, and that's what's not disclosed here. The nondisclosure is not nondisclosure of an inevitability. It is nondisclosure of huge sales to miners, which hid a risk of volatility. Telabs on remand tells us that hiding facts that expose volatility is material nondisclosure. That's because investors don't want to be riding a roller coaster going up and down with the volatility. And that was exactly what was not disclosed here, that risk of volatility, and it's what materialized. When it was ultimately disclosed that the crypto sales had been there and they had collapsed, the stock price fell 28 percent because the defendants said, well, we're not going to be able to make that up for about six weeks. We're going to lose $600 million because of the excess glut, $600 million in inventory. Joseph, let me ask this. NVIDIA created a new product, the Crypto SKU, specific to the mining demand. And this was in May 2017, during part of that class period. And it seems that that was an effort by the company to try to address that demand that everyone understood both internally and externally was occurring. Why is it necessarily false or misleading to be right or wrong as to whether that product was going to capture most of the demand? Because they had five sources of data telling them it was not doing so. They had the centralized sales database. They had the GeForce experience data. They had the top five emails. They had quarterly review meetings. And then there were one-off presentations like the one Mr. Fisher got. He also got weekly sales reports from China. In the abstract, that was an effort. It certainly was. But there's also evidence in this record from FE2 who was at headquarters. Now, he left down at the beginning of the class period. But there's evidence in this record that when miners would come to headquarters to make bulk purchases, the company would try to upsell them. And then when they weren't able to do that because the miners don't want to pay extra, they would send them to distributors to purchase additional GPUs from NVIDIA through the distributors. But, again, that was FE2 left before the class period began, before the introduction of this crypto SKU. And so that doesn't speak to whether any of the individual defendants or NVIDIA knew rightly or wrongly that it was going to capture most of the demand that was in the market. No, Judge Sanchez, that's absolutely true. But what they do know is what the information is that they're accessing because Mr. Wang, the CEO, says he's accessing the central sales database. He's got super user status. Now, he says that to FE2. Okay? He leaves. But there's no reason to believe that stopped. If we were at trial, we would say that's evidence under Rule 406 of habit or routine practice. But we don't have to go there because inferences are drawn in favor of the plaintiff at this stage. There's no basis for them to assume that the crypto SKU is doing what they know it is not when they have the G4 standard. Can I interrupt? There are two basic questions here. One is were the statements made particularly by Wang but also by the others, but were they not just forward-looking but were they wrong with respect to what had happened? So if we're talking about forward-looking, I mean, there's a safe harbor for that. So the question as to falsity or misleading is as to representing what had happened. And the second one is scienter. Now, Judge Gilliam ruled against you based on scienter. He didn't reach the falsity as to when we had the amended complaint. Can you address scienter? Yes, I'd be happy to, and I'll do it directly with Mr. Wang. Mr. Wang, I'm not going to go into what we have in the brief, is reviewing the G-Force experience data as well as the centralized database data. And what he said was in the November 10, 2017, VentureBeat interview, crypto is small for us, not zero. It's large for somebody else, but it's small for us. Now, that quarter, we had an independent economist. RBC did its own study, but we had an independent economist do a consulting work, and it showed that $299 million of crypto sales were made that quarter. That's more than the sales of three of NVIDIA's other divisions. And $229 million of it was reported in gaming. That's three times, more than three times the amount that they reported in the crypto SKU. Now, he didn't have the PRISM study, but he had the data showing the explosion in demand. Here's what they were doing. They were monitoring crypto sales in real time. They were seeking to capitalize on crypto sales. They were projecting. In their projections, they included crypto sales. Nothing limits that to the crypto SKU. They were discussing crypto sales at headquarters. FE3 is at headquarters throughout the period. He says that was a common topic. But there's no specific evidence of the content of this database. So one of the omissions that I think might be material is the fact that that database, there's nothing here that alleges that the database was reflecting that GPU sales were 60% of the gaming units for crypto. Well, I mean, that is the testimony from those who were reviewing it. But not at the level of the. It's true, Your Honor. But in Oracle, what they said was they had a database where they could review it in real time. Nobody said on a given date what this database said. And the falsehood was saying that the decline in the economy would not hurt them. In quality systems, they had only very general statements. Our current pipeline and our projected pipeline are robust. And what they have are weekly reports going to the CFO, weekly or monthly. It says both in the opinion that go to the CFO. But that doesn't say what anyone said at any given point in time. Now, we have evidence from former employees that are actually looking at this information, saying it shows the G-Force shows 60% during the class period that the centralized sales database, which Fisher was receiving. Well, let me ask about the G-Force, because I was unclear about something. G-Force is a usage database. Correct. How does that reflect sales? They make a point. They rely on some material that was put in, not for the truth, to say, well, there's a delay, a material delay between sale and usage. If that's the case, then they couldn't make the statements they made. They couldn't be saying in any given quarter it's probably 150 million because they couldn't know. It would be months later before they would know. Well, the difference is the 150 million are sales of the SKU units. But the G-Force usage, it relates to what is someone using this GPU for. And I guess here's what I was troubled with. How does one know whether the GPU sales are purely for crypto or some combination of crypto and mining activities? And if it is that combination, then would it be a falsehood for someone to say that gaming is driving this demand? In paragraphs 107 and 108 of the complaint, Judge Sanchez, we have Ms. Kress, the CFO, saying we can see you light up. We know whether you what games you're playing on this. So they actually have that information. So when the G-Force data shows 60 percent is actually going to gaming, it's because they can see that. She says it again in 108 and in 107. She says those things. So they have that data. Now, there's nothing in the complaint to suggest that there's a material delay between sale and installation. Maybe they can show that at trial. Maybe they could show at trial or in discovery that even though the rise in the sale of NVIDIA's GPUs, they admit it's at the same time the crypto demand is going up. They say that at page 23 of their brief. Maybe they can establish at trial. That's purely a coincidence, even though what happened to their biggest competitor, AMD, in 2013 and 2014, would suggest that's going to be hard. But that would be an issue for trial. Here we're dealing with a complaint, and at the complaint level we have five sources of data telling them that there are heavy sales to miners. And with five sources of data, they can't just blithely assume that the sales of this crypto SKU are sufficing, especially when they know because miners are coming to the company and they're trying to sell them up, and they're not getting anywhere with that. So there's no basis for the statement. Let me put it another way in terms of deliberate recklessness. In the fall of 17, Mr. Wang and Ms. Kress are peppered with questions from analysts asking about whether there's cannibalization of the gaming cards by crypto. And they make categorical statements. They don't have any material. There's nothing material that's going on here. If that is belied by contemporaneous data, according to five former employees who had access to this various data at different points in time, and if they didn't look, then under Reese v. Malone, that's deliberate recklessness. So to say they shouldn't know, then they should say, we don't know. They shouldn't say what they said, which was to make a categorical statement. It's small for us. It's large for somebody else. It's $70 million. Or trying to capsule it so that people think that it's only those crypto sales. That's why RBC did an analysis afterwards. And RBC, nothing to do with the plaintiffs, for a longer period than PRISM, said there were $1.95 billion in crypto sales during this period. Given the access to data that they had, we respectfully suggest under core operations that it is absurd to suggest they were in the dark as to what was causing this gigantic rise in revenues. By the first quarter of their fiscal 2019, they were two and a half times more revenue than two years earlier. Thank you. I'll reserve my last minute and 55 for rebuttal. Thank you, Your Honors. Good morning, Your Honors. Patrick Gibbs from Cooley for NVIDIA, Mr. Wong, Ms. Kress, and Mr. Fisher. May it please the Court. I want to note a couple of important contextual points here. First of all, plaintiffs have challenged 13 different statements. The statements were made over a period ranging from May of 2017 to November of 2018. During that period, according to plaintiffs themselves, cryptocurrency prices and therefore crypto mining demand for GPUs was highly volatile, changing continually. During that period, the one thing that NVIDIA consistently told the market in every one of its quarterly earnings calls was that miners were buying GeForce chips. Plaintiffs ignore that, but it's clear from the record that the company was saying that constantly. Well, the question is how much. Indeed. And saying, well, they're not. I mean, as I read those statements, I mean, everybody asking those questions knows what happened to ADM with respect to Bitcoin. So everybody's worrying, okay, what are you selling and how much? And as I read those statements, they are obfuscating. They're not saying, you know, we're selling them in this OEM that we set up. That's what they are saying, but they're not saying, and we're selling an awful lot of them under the gaming category. They're not saying that. Well, respectfully, I think they're only obfuscating if you limit yourself to the selective quotes the plaintiffs pulled out of the longer statements and if you assume that they actually know what the real number is, and I'll get to that point in just a minute. The question of knowledge is a different one, but in the sense of what they're saying is that accurately representing the reality, I think it is not. Well, I don't agree, Your Honor, but we'll get to the science in a minute. Of course you don't. But for present purposes, the point I want to make, though, is they said different things at different times. And so I don't think it's appropriate under the PSLRA to try to just summarize or characterize the statements. What the plaintiff has to do here is look at each separate statement, and the statements changed over time. In August of 2017, they say they think that the $150 million in crypto SKU sales have absorbed most of the crypto demand. But let me just give you one example. Wong is answering one of the questions. He says, I would say the large majority of the cryptocurrency demand is out of that specialized product, that's OEM. There are some small miners that buy GE forces here and there, and that probably also increased. I think that's just wrong. Well, we don't know that it's wrong, Your Honor, because we don't have specific information about what Mr. Wong knew at that point in time. No, no, no, his question is not what he knew. I'm asking is it wrong as a matter of fact. Yeah, well, okay. Let me shift then because I want to address that point. The plaintiff's complaint and presentation talks about G4 sales to miners as if it is a known fact. It's just a fact. Those characterizations, that hyperbole is inconsistent with their own factual allegations. And I want to refer the court to paragraph 121 of the complaint. It appears at ER 360 and 361. This is one of the most concrete pieces of information that plaintiffs have from inside the company. This is the so-called China presentation from September of 2017. And if you look at the slide that plaintiffs chose to include in their complaint at page 361, it says, China April through July mining sellout data. It makes crystal clear it is nothing more than an estimate. It says estimated GPU sales out. And it distinguishes between the mining SKU and G-Force. That's GTX is G-Force. For the mining SKU, they have very specific numbers, 20,210 units in May, 193,784 units in June, 271,884 units in July. For the G-Force, they have numbers that are obviously rough estimates, 40,000, 350,000, 350,000, 100,000. So this, their most concrete piece of information from inside the company, not filtered through Plaintiff's Counsel's investigator, not filtered through Plaintiff's Counsel, but directly out on paper makes crystal clear that the people who plaintiffs argue knew exactly what was selling out and to whom are estimating. It's a rough estimate. It's obviously a rough estimate. I looked at this slide and drew something else, and I wanted to hear your thoughts about it. If the green bar for GTX for the G-Force, it seems to be going down after the introduction of the crypto SKU. And if the gray bar is what represents the crypto SKU sales, then it does indeed seem by June and July that crypto was capturing more of the demand in the market. And am I reading that correctly from this particular slide? Assuming we could extrapolate this information both to the individual defendants and to global sales. Yes, and that's an important caveat. But, yes, that's how I would read that slide as well. And, remember, the company introduced this new crypto SKU in May of 2017. It's a brand-new product and a brand-new market for them. And in the first three months, they sold $150 million worth of it. And I do think that kind of information would inform a judgment about how much of the mining demand they have been able to serve with this new product. So let me just make sure. All right, so if this slide accurately reflected global sales, and I know this is just China, then one could argue that the statement that the majority or vast majority, however you want to characterize it, of crypto SKU sales captured the mining demand would not be incorrect if this were true. That's how I would read it, Your Honor. But so I think it's important, as the court considers all of the allegations holistically, to keep in mind that the one concrete piece of information they have out of the company makes clear that when they're trying to estimate how many GeForce chips are being sold to miners at the end of this multilayer distribution channel, they are estimating just like PRISM estimated, just like RBC estimated, just like, as we've noted, during the class period, various of the public analysts were also estimating. Because nobody knows, even today, exactly how many of those GeForce chips that were sold back in 2017 and 2018 were purchased solely for crypto mining and not for gaming. And that's a key foundational fact to the whole case. Let me push back on that a little bit because plaintiffs allege that the basis for the centralized database are these offer sheets where they're able to track what the end user is. So why, you know, if that's correct, why couldn't the company have a closer, more granular understanding of the mining sales than what you're suggesting? Well, so there's all sorts of gaps in that allegation. There's no information about how many of the resellers submit those sheets, how accurate are the sheets, how much of the market do they cover. But most importantly, if it were true that they know exactly who's buying them, then why did the China team have to estimate? Why is this not a bunch of precise numbers from those order sheets? Because they don't actually know. They didn't have enough confidence when their bosses asked them. But estimating is different from not knowing. It's different from not knowing. Well, that's, yes. I can estimate that it's going to take me 45 minutes to get home. But I know pretty much how long it's going to take me to get home. I agree, but different estimates have different levels of confidence to them. And within any given company, if you're estimating something that you don't know with precision, you might have multiple estimates. You might have different people who have different opinions about what's the right way to estimate something, what's the best estimate for something. This is their best estimate, or they wouldn't have put it up there. Well, this is the best estimate of whoever prepared that presentation. Somebody else at headquarters might have a very different view. We don't know because there's too many gaps in the complaint. Is there any allegation that the individual defendants saw this presentation? None. It says it was commissioned, whatever that means, by Mr. Fisher. It then traces it up to FE1's bosses. The trail stops. It doesn't say this was ever given to Mr. Fisher. It certainly doesn't say that Mr. Fisher turned around and gave it to Mr. Wong. And in any event, the thing is dated September 2017, which is after the large majority statements that Your Honor was reading. And so this presentation tells you nothing about what Mr. Wong had in front of him, what information he knew when he made the statement. What about the G-Force experience data that plaintiffs are relying on? So the G-Force experience data, I don't think they have sufficiently explained how that could give one a reliable estimate of how many G-Force chips are being bought by miners. I think they have the same problem with their own allegation about these estimates. If that was hard information, if it was known, then I would expect that the China team would have known it and wouldn't be estimating at these rough levels. But also the allegations about the G-Force data don't tell you when did the G-Force data show 60%. The allegation is that's what it showed throughout the entire 19-month class period. They can't possibly be claiming that on every single day of that 19-month period it was 60%. Their own allegation is that the mining demand is fluctuating wildly. That's the whole point of the case, is that it's unreliable and it is variable. So it's not plausible, based on their own allegations, to think that that GFE database is showing 60% throughout the entire time period. And if it's not showing that, then we don't know what it showed and when, and we have no facts showing that Mr. Wong actually accessed that information on any given particular date. Counsel mentioned Mr. Wong's comments on November 10, 2017. You can't tell from this complaint what did the GFE database show in or around November 10, 2017. And you can't tell from this complaint, you cannot draw a strong inference, that Mr. Wong was aware of whatever was in the database at or around November 10, 2017. And so you cannot, from this general allegation about 60% in the database throughout the class period, conclude that when he talked about small but not zero on November 10, you cannot draw a strong inference that Mr. Wong had any idea that that number was in the GFE database on that date or that that number was, in fact, in the database. Let me ask you about the September 2017 interview where that question was posed about the cannibalization of GeForce GPUs by the introduction of the SKU. Does the cannibalization comment or question suggest that the crypto SKU was cheaper and would deliver the same sort of computing power that the miners would want? I guess what I'm getting at is, and I go back, this was the question that I posed to counsel, how do we know whether gamers weren't also miners or whether it was just one or the other? Is that a knowable thing based on the database or based on what's been alleged? I don't believe the complaint gives you a basis to say they knew with certainty who was mining, who was gaming, and who was doing both. I don't think the complaint gives you a basis to infer that they knew what was the purpose for every single purchase at the end of the channel. And the company made the very point that Your Honor has alluded to during the class period. There may very well be people who are buying the chips because they're gamers and they're going to do some mining at night while they're sleeping and not gaming. And so by its nature, this question of what's driving demand for GeForce chips, which are a general purpose, they can be used for many things. They are designed and marketed for gaming, but they can be used for any number of tasks. And so in that setting, the question of what impact cryptocurrency mining is having on sales of this product that has multiple uses even for a single user is not a simple yes, no. It's not a is the pipeline robust, is the pipeline declining. It's a much more complicated fact than that, and I think that bears both on the falsity analysis here but more especially on the scienter analysis. The heart of the scienter analysis is the plaintiffs have to point to a particular statement and they need to plead particularized facts showing that when that statement was made, the speaker was aware of facts that rendered it false or misleading. And none of the allegations here come close to giving the court that level of specificity for any of the 13 separate and specific statements that they claim were false or misleading. The statements are all very consistent with each other, so I'm not sure that I need to find any particular one because all of the statements are more or less to the same effect. I read them differently on, or I think the message changes over time. There are four of them that I would not find actionable for sure, so if I take those four out, the rest of them are pretty consistent. Again, I don't necessarily agree. I do think the message changed, but even if that's true, you still have to have a strong inference that when one of those statements was made, the speaker was aware of facts making it false. You know, from one of the FEs, I forget whether it was FE2 or FE5, that talks about Mr. Wong and his attention to detail and his prodigious memory. We have his analysis or his examination compared to a proctology examination. This is not an inattentive man. He is not. I would attest to that myself. He's extremely bright, but he can't know what he can't know. Not only bright, but attentive. He's paying attention to his business. Well, very few CEOs will come out and say, I don't pay attention to my business. So I haven't had a case yet where they didn't say the CEO was hands-on and paid close attention to the business. But the point is, he can't know what is not actually possible to know. And, again, their own allegation shows that when asked by their bosses to figure this out, they could do no better than estimate at levels like 40,000, 350,000, 100,000. That is not reflective of the type of fact that even a hands-on, highly attentive CEO could necessarily know with the type of confidence necessary to say he lied to his shareholders. You don't have those kinds of facts here. Thank you. Thank you, Your Honors. Let me address the chart first, all right? And Your Honor's question, can it be generalized that this trend for this period of time extended? And the answer is, that's why the Plaintiffs' Council had an independent economic study done. And if you look at paragraph 154 of the complaint, there is a chart that shows that through this period, the amount of sales being recorded outside of the crypto SKU is rising dramatically. So the experience in China is the experience in China, and we put that in. We're putting in all facts. They're aware of the fact that there are sales outside. They're aware that this is what the investment community is extraordinarily focused on. But this is based on an assumption about market share, correct? Well, it certainly is, Your Honor. One of the problems is we've had no discovery. And when we talk about specificity, let's talk about the limits that specificity can provide. We're talking about former employees. They no longer have access to the e-mails. They don't have access to the database. But if you look at Nursing Home, there was no allegation what that database said on any given day, and that was not dispositive at all. And if you look at Quality Systems, there was no allegation about these reports and what they said, what any particular report said. It's beyond the ability to address. And let me just say what we're ultimately talking about is how much securities fraud are we willing to tolerate, and I don't mean that in any pejorative sense in any case. But we're talking about where we're drawing a line. And the harder you make it to plead, the more this becomes pleading like we're pleading in the 15th century, and it becomes harder and harder to police this market through independent actions, which is what the private action is intended to do. I've run out of time, so I don't want to overstep. Thank you very much, Your Honors. Thank you, Mr. Chisholm. Okay. The arguments will stand submitted. All rise.
judges: WALLACE, FLETCHER, SANCHEZ